is number 22-30404 Wilkins v. Liberto. Mr. Collins. Yes, Your Honor. Good morning. I think it's still morning. Good morning, Your Honors. Chadwick Collins on behalf of the firm Milling, Benson Woodward, on behalf of the two defendant St. Timothy Parish Sheriff's Office employees, Michael Liberto and Matthew Severns. I also have with me this morning Kenneth Whittle from my office who is making his first appearance here today before this Court, so I wanted to introduce him to you all as well. All right, so let me begin by saying that thank you for allowing us to argue this morning this case. I've listened to the two cases that were argued before you, before us in this case and I would submit to you the factual and legal issues presented in our case is far simpler than I think what you heard in the two cases before, so hopefully, God willing, I'm going to use not all of my time, we'll see. So I'm going to start with some of the basic facts. The facts of this case are pretty straightforward and I would submit to you probably 95% of the facts are not even in dispute. So you get to really my key question is, is this about disputed facts or is it about something else? There is a disputed fact, I think, and it's sort of a mixed question of fact and law and that is causation and did the plaintiff meet his burden in rebutting what we put into evidence at the Rule 56 Motion for Summary Judgment to show there was no causation, which is a necessary element under excessive force under the Fourth Amendment. Let me ask you, Preliminary, is there a rule in the Eastern District as there is in many other districts that when a party moves for summary judgment, each party has to put in all the pertinent evidence along with the motion? Yes, ma'am. All right. And you said that he didn't even put in plaintiff's deposition. I believe that is correct, Your Honor. Well, your brief says that. I think they may have put in some parts of it and we probably put in some . . . Well, you can put in parts, of course. Sure. Okay. All right. So, and the depositions of the two defendant deputies were never taken, so the only testimony you have from them are the two affidavits which were attached to our summary judgment. Is the fact issue, the causation issue that you alluded to specifically what caused the broken jaw? Yes. Is that it? Absolutely. That is it. Okay. So the facts are very simple and I'm going to roll through them very quickly. October 7th, 2019, Mr. Alex Wilkins' mother, he's living with his mother and father at the time, he's an adult but he's living there, is concerned about his well-being. So much so, she goes to the St. Harry Parish Coroner's Office in order to obtain an order of protective custody because she believes he is on a self-destructive path because of his alcohol and drug abuse and his behavior and his enunciated suicidal ideation, all of which allowed the coroner's office to, under Louisiana law, allows a coroner to take hearsay. Law enforcement can't. It has to be first-hand observation. But a coroner can take hearsay and the coroner issued an order of protective custody. So what did our two deputies do? Well, they were dispatched. And this is where kind of as a society we all have to grapple with this because there is an intersection, unfortunately, between law enforcement and the mental health world and it happens every single day in this country, all right? These two officers go out to do their job. I have a case pending in the same courthouse right now, I don't know if it's before you right now, where our deputies went out to a scene to take somebody into custody. The EMT said, oh no, I'm not doing it, you guys do it, because this person was combative. Same thing happened here. There's no one else that does it. It's law enforcement and if they don't do it, no one does it. He does admit in his testimony that he did not want to go and that he tensed up when they tried to get him to walk out the door. So there is, I think it is undisputed, there was resistance and reluctance to leave the residence and go to the hospital. Now the question is the degree of his resistance and the degree of his combativeness, we'll get into that in a moment, but yeah. The facts are, we showed up at his house, his mother and father's house, mother was not there yet, father was there, deputies announced themselves, the father lets them into the home, they have a brief conversation. What did they know about his pre-existing condition, whether he had been inebriated, whether he had been sleeping, did they know anything about that? I don't think that's in the record, Your Honor, and I will tell you from my own personal experience, I don't think they knew anything other than they had been issued an order of protective custody. Right, I don't think they had that knowledge going into this. They were dispatched as all law enforcement is, they're out, they get a dispatch, dispatch says go to this resident, you have an order of protective custody, take this individual in custody, bring him to the hospital. End of story as far as they're concerned, they go follow orders, they're good soldiers, they do what they're told. So they go to the residence, they talk to the father, father lets them in, they have a conversation. At some point, Mr. Alex Wilkins wakes up, he's sleeping on the couch, they explain to him, this is why we're here and this is what's about to happen. Admittedly, at that point, there was no resistance. They get him up, he talks about whether or not he's going to put his shoes on, not take his shoes, all of that. They get him in cuffs, start walking him out the door, and he's asking for a cigarette, they tell him you're not going to get a cigarette, we're getting in the car, we're going, we're not sticking around. At that point, that's when the facts sort of diverge, all right? We have a dispute as to facts, and if that's all this case was about, we wouldn't be here right now. We'd have gone to trial and then we might be here after the trial, depending, I might be on that table. But that's not what happened. What happened was, we had those facts and the facts are, he claims we took him to the ground and bashed his head on the floor and broke his jaw. That's the facts as alleged by Mr. Wilkins. The facts as alleged by us is, he resisted, he was in an escort position, which is when an individual has their hands behind their back in handcuffs, the officer puts his arm underneath the arm of the suspect, bends him over, uses his body weight to obtain leverage, and escorts him out. It's a common practice used in law enforcement all over this country, every day. That's what happened according to us. He continued to resist, started kicking, at that point they used another technique, common in law enforcement, which is to take him to the ground. They don't throw you down, they don't beat you, they take you to the ground in order to obtain control over you, de-escalate, allow you to calm down, get you back up on your feet and take you to the car. That's what happened according to our officers. Okay, so that's pretty much the facts. He goes to the hospital, he's treated, he ultimately has surgery to repair his broken jaw. Alright, well, the lawsuit is filed, he alleges we broke his jaw. Well, we start doing our job as lawyers, we do discovery, we obtain some records. The records show, hmm, looks like he has a fracture to his jaw four days, I'm sorry, three days earlier, October 4th. This incident occurred on October 7th. On October 3rd, I'm sorry, October 4th, he is x-rayed at a Lacombe Dental Facility and there is a fracture in the mandible, according to Dr. Bradner, alright. Now, the district court for some reason thought that that was technical jargon unknowing to a layperson. I would suggest to you, a fracture to the mandible is knowable and it is something most people probably understand, which is, that's a fracture to the jaw, broken jaw. The judge could have looked it up in a dictionary. I think he could have as well, but for some reason he took issue with the fact that my they practiced. Let me, is there some question about that was in the left side of the jaw and at the hospital they found one in the right side? I'm not aware of that, Your Honor. I didn't see that anywhere, I don't know. You've got something that you want to point me to that's, there's only one fracture that I'm aware of and it was the fracture that was identified by the Lacombe Dental Clinic on the 4th of October. That same film was interpreted, reviewed by Dr. Bradner, who's an oral surgeon, practices on the North Shore, retained by us. He looks at it. He examines Mr. Wilkins at our request and he gives his expert opinion, says, in my opinion, this injury predated his interaction with law enforcement. In my opinion, the injury could not have been caused as alleged by Mr. Wilkins by his head going to the floor. It had to be some sharp, you know, some sharp object would have hit him, like a punch. Why do I say punch? Because his father testified he had been in a fight a few days before this incident. Now, Mr. Wilkins denied it and that's fact stuff, but I'm giving you that sort of sauce for the goose because it's important to know all of these things when you drill down to the fact that when we had a Rule 56 summary judgment, we presented the court with evidence that suggested unequivocally this injury preexisted his interaction with law enforcement. And what was given in response to that? What did the plaintiff do to meet his burden at that point in his pleadings? Nothing. He provided one medical record. The hospital x-ray showed that both sides of his jaw were fractured. Judge, I'm not aware of that. I'm aware of Dr. Bradner's . . . Okay. Dr. Bradner's opinion, which I quote . . . That's okay. I mean, the x-ray's in the evidence anyway. It is. Well, the x-ray may not be. The report from Dr. Bradner and his affidavit is. I understand your doctor there and there's also a hospital record. There's a hospital record that was put in with nothing else. Right. No cover letter, no explanation, no affidavit, just here's a piece of paper. Look at it and decide if they're not . . . So it's not even proved up as a business record? I don't think so, in my view, no. But you didn't object to that? No, we didn't. We didn't . . . Well, I think we did take issue of the fact that this piece of paper does not meet the burden that the plaintiff has at that point, yes. We did object to it in that sense. Okay. We didn't get into whether or not it's properly authenticated, because frankly, I probably had the same piece of paper in my office from the same facility, but I had a whole lot of other records, two, three hundred pages of them. Right. Just to maybe skip ahead a little bit, I know you moved for summary judgment on the basis of qualified immunity. Yes. Yes, Your Honor. It's denied by the district court . . . And that's the legal stuff. For what . . . You're right. Qualified immunity is why we're here, all right? And it's one of the things . . . I represent the Sheriff's Office a lot, and it's a tool that we have in our toolbox that's a useful tool, and look, it gets a lot of bad press in today's society right now, but I would say . . . What does? Qualified immunity. A lot of people . . .  I know you do, and I'm not going to give you . . . I'm not going to get into what it means, because you guys have . . . We just have to apply our precedents, that's . . . Absolutely. And that's why I want to . . . If I could just address excessive force, and then I'm going to jump to qualified immunity, because the two are intertwined here. Excessive force. The judge got it right when he quoted Buehler, Fifth Circuit case from 2022, said, the right to arrest carries with it the right to use some force. That's from Judge Zaney's opinion. He's right. And he says, also, on page 10, he says, if the broken jaw pre-existed the law enforcement encounter, no claims could survive. Judge Zaney got it right then, too, but what Judge Zaney, I think, kind of went off the rails is, he ignored the fundamental question that exists in every excessive force case, which is, is there causation? You have to have injury, you have to have causation. We can all agree the man had a broken jaw. I'm not disputing that. In fact, the record, my own doctor says that. But what we can't agree on is what caused it, because apparently, everybody says it existed before this injury, except Mr. Alex Wilkins, who's not a doctor, who didn't take his own X-rays, didn't look at any X-rays, not qualified to look at X-rays. All he says is, I think you broke it that night. Well, your own X-ray, your own . . . and your own record suggests otherwise. And the only person who gave any testimony on this is Dr. Bradner, the expert oral surgeon who looked at it and said it existed three days earlier, right? So the district court failed in its duty to look at excessive force and what are the necessary elements of it, and did it meet, did the plaintiff meet his burden at that point in the pleadings, Rule 56 stage. So, let me see if I understand, did the district court deny summary judgment based on finding a genuine issue of fact as to causation? Yes. And are you here contesting whether there is a genuine issue of fact as to causation? No. Yes, I am here to say there is no question of fact. There's no genuine issue of fact? No. There's no genuine issue. And again, I don't understand the weird spot we're in here where in qualified immunity we get to argue this and it's supposed to be on the law, not facts, and there's a distinction you're not supposed to appeal qualified immunity on fact. I'm aware of that, but this is not a case of he's got some facts, he's got an expert that says one thing, I've got an expert that says something else. No, we've got one set of evidence that says the jaw didn't get broken that night. That's it. That's it. All the evidence says that. And that he, the plaintiff said, well, I just disagree. We grant immunity periodically where there may be three or four officers involved and the evidence shows that one of them had nothing to do with the alleged excessive force. So that's a no evidence, this is a no evidence. And that's qualified immunity? That's it. And look, the judge, the district court, everybody can . . . we can all parrot the language from qualified immunity cases. Thankfully, qualified immunity has been discussed by the Supreme Court and this circuit so many times we all know clearly established, all those buzzwords. The problem is oftentimes the district courts kind of go off the rails and don't really apply the law. They just think about these general principles and they do what the Supreme Court has warned time and time again to avoid, which is to say you do not make these general pronouncements of you have a constitutional right to be free from excessive force, therefore you used excessive force, therefore there's no qualified immunity. That's kind of what they did in this case, in my view, because the district court and the plaintiff, no one ever identified a case that said here's a case, here are the facts just like this case, and yet . . . and that was clearly established. So Officer Liberto, Deputy Severance, you should have known better. Where? Where's that case? It doesn't exist. Well, we have a bunch of cases where a plaintiff alleges the facts are that the plaintiff was not resisting and the cops pounded a head against the window of a car or whatever and that was said to be excessive to the immediate need. Well, and that would get into the whole Graham question of how significant of the . . . I understand in this particular area it's not fully in accord with what the doctrine of qualified immunity is supposed to say. But anyway, they cite . . . I mean, you know the cases. There are such cases. There are cases, Judge, that say when you've got someone in handcuffs and they're in a police station, you can't just go beat on them. Right. Look, I'm not disputing that that's the law, because that's not what happened. We've got an individual who's being escorted out of his house and admittedly resisted. Then we get into what happened and was he really injured. I don't think you even have to get past that, because if he can't show causation, you can't ever get to the other questions you have to ask. We understand that and I'm not . . . I don't mean to cut you off, but we've heard it. Okay. You've already . . . you made your position very clear. I will . . . I've got five minutes, I guess, on rebuttal. Yes, sir. I've got a couple of things I want to cover with you, but I'll do that on rebuttal. That would be good. Thank you. All righty. Mr. Bickham. Yes. May it please the Court, Your Honor. I'll get straight to this, Judge, but make no mistake about it. This is a qualified immunity issue and excessive force. Your Honor's raised some good questions. There was a dentist, their expert, who made the mention about a fracture being present. The plaintiff, a couple of days prior, had a tooth extracted on a completely different side of his face, right? This was brought out during his testimony, during his deposition, all of that. The area where he's complaining about his jaw popped after a peaceful encounter with the officer was completely different. That was where the excessive force came from, and that was the evidence that we're presenting in terms of that. Well, I understand that, but the evidence in the record is that the dentist says that the x-ray from the tooth extraction event also showed a jaw fracture. On that particular side, Judge. I think that's where it was from . . . Where is that? Is that in Dr. Brandley's statement? I'm not sure Dr. Brandley even differentiated on what side or . . . Well, certainly Judge Zaney didn't. Correct, Judge. That is correct. It would have been a lot more persuasive to me than Judge Zaney said, well, they're using multi-syllabic medical terms, and I don't know what it means. If this was as easy as left-right, then he would have had a fracture on the left side of his jaw two days before this occurred, and then he gets a fracture on the right-hand side of his jaw. Then, the third deputy, Cook, says, I saw him eating food, and he seemed to be articulating his words well enough. Judge, if that was the case, there's no way he would have required an immediate surgery after that. This was . . . the injury happened when the surgery was right after it. He wasn't complaining about any injuries prior to his encounter with the officers. It was a simple tooth extraction. You didn't offer that. You did not put his deposition . . . exactly what aspects of plaintiff's testimony did you put in response to their summary judgment motion? We didn't put the entire deposition or the entire medical records. We just put the ones that basically spoke to the causation issue, Judge. What did you . . . did you put in the . . . you didn't put in a statement from his dentist two days previous? I did not, Judge, because that actual wasn't in dispute. My client was clear that when he was taken to the floor or slammed to the floor, he heard his jaw immediately popped. He became in excruciating pain at that point. I think this wasn't no minor incident with the officer. If that was, I mean, oh, he's right, injuries do occur with takedowns, but this wasn't a minor injury. Instantly when he's taken down, he heard it pop. They have fact witnesses that will testify about him complaining about the injuries there. His mouth was bleeding, and again, he had to have surgery shortly thereafter. Was he resisting? He was not resisting, Judge. You asked about earlier, did they know the condition? When the officers arrived at the home, his father answered the door and told them, well, my son is in the back room asleep. So they went back there, woke him up. This was no act of resistance. Of course, he didn't want to go with them, but he was walking through the house, and I think their own witness did testify that he stopped. He wouldn't move anymore. There was no evidence that he kicked them or he punched them or was trying to injure them whatsoever. None. Well, didn't they have to pick him up at some point? They slammed him to the floor. They picked him up and slammed him to the floor, according to his testimony. That's what happened. Did they pick him up to sort of drag him along? I mean, that was what I inferred. Maybe I was wrong. That's what the defendants say, Judge. My client said he was talking to them, and at some point, they became belligerent and slammed him on the floor. This is what he says. But again, this wasn't no act of resistance. The officers were not . . . it wasn't a hostile situation. It was never in harm.      I don't know. I don't know. I don't know. I don't know. I don't know. I don't know. He testified. My client, Mr. Wilkins, testified this at his deposition. He said that the injury occurred on the jaw that he was slammed onto the floor, and it was completely different from when his tooth was extracted. But all he said was his tooth had been extracted on the other side of his mouth, is that what he's saying? Correct. Yes, yes. But there . . . what . . . this is what confuses me, because there is an allegation that Dr. Brandley said, I found evidence of a fracture on the jaw two days before, and then Dr. Brandley said that I think it had to have been caused by a punch, not by slamming him on the . . . So where is this about . . . So you're saying I'm just completely wrong when I'm thinking . . . and this could be, you know, my error, that he had a preexisting jaw fracture. Correct, Judge. I think the expert's testimony is consistent with the tooth fractures, what he was referring to, in my opinion. But based upon the injuries and the necessity for a surgery that quick, it just doesn't match up. I mean, because my client was completely fine until the incident that occurred. Well, he could have had . . . I mean, you know, you can have a sliver of a fracture, and you don't have to have surgery, but if you go down to the floor suddenly, then it may exacerbate it. I don't think . . . I think that qualified immunity probably shields police from the glass jaw theory, but, I mean, that's one possibility, but . . . If the injury was so hard that it aggravated a preexisted injury to the fact that he needed to have an immediate surgery, well, then that still could be excessive force, because officers take their suspect, how they get them. So I don't believe that it was necessary that whatever existing fracture or extraction that he had was to the extent where it required the medical attention shortly thereafter. So I think they're completely . . . they're not shielded from qualifying immunity as it pertains to that, and I think the district judge made the correct argument with that. This is definitely a case where it satisfies the two-pronged test to defeat the defense of qualified immunity, that the defendants violated the constitutional right that was clearly established, excessive force. This was not a hostile situation. It's the law established that when making an arrest or detaining a non-fleeing, non-intoxicated suspect, an officer cannot use excessive physical force by slamming the suspect's face to the floor to the extent that it requires that type of medical attention that it did. Well, let's . . . I mean, just to clarify my own thinking, take everything that you as he's being escorted out of the place, although something provokes him to take him to the floor, but he has a pre-existing jaw fracture, and the dentist says it's a pre-existing jaw fracture, and you have no evidence to say there was no pre-existing jaw fracture. Then what happens? So then, I think, under that scenario, you would look at the injuries that occurred after in a medical treatment that was associated with after that incident that aggravated it. And that was my point. It was like, because he had to have the immediate surgery, his jaw was wired, he had to have a liquid diet, none of this existed prior to his interaction with the officers. It took him several months to actually heal up from the surgery and from the damages that occurred after this. Again, this is all in the medical records. And my understanding, if the fracture that they're talking about was there, then all of this would have been present at that time. But he testified with his deposition that he was in no pain, he had already completely recovered from the extraction. So, yeah, so we believe that we met the prongs to satisfy that the defendant wasn't entitled to qualified immunity as that. In terms of the excessive force, again, it's that these two are related. We think that force, that they took him down to the floor, it was unconstitutional because of the injuries suffered as a result of that. The defendant takes a lot of time talking about causation with this. Well, this isn't a complicated issue. The plaintiff is saying that the defendant slammed my head to the floor, bashed my head on the floor, broke my jaw. He testified to this several times. That's the causation. You took me to the floor, my jaw was broke. These claims are supported by the medical records because he had to have immediate surgery. And because of all the damages suffered as a result of that, that's the causation. We have the medical records to show that, that will be offered at a trial on the merits, and the testimony of witnesses will cooperate this as well. That's the causation. We don't have to have an expert witness to determine what caused this particular incident. If this goes to trial, I think you probably will have to have an expert witness because if there was a pre-existing fracture, the jury still has to determine that this was force such that every reasonable officer would have known that no force could be used under the circumstances. Not a little force, but no force. In other words, if he has his arms behind his back, then everything turns on the credibility of your client. If there was a pre-existing fracture, then that's really going to heighten the question about the credibility of your client, frankly. I agree, Judge. Again, I think a trial, in fact, can look at the extent of the injury sustained as a result of the incident. Again, it will make a credibility determination on whether they believe the plaintiff or whether they believe the defendant. I think that's perfectly fair for a trial, in fact, to make that decision, and we believe the district court got it right in regards to that. All right. Thank you. Okay, Mr. . . . I'll be very brief. I know it's been a long day for everybody already, so here's the thing. When I get ready to do an argument like this in front of a court of appeal, thankfully, we have the resources to research the opinions that the judges on our panels have rendered in the past. I did that with the help of Mr. Whittle, and I was able to find a few cases because all of you have been on the bench a while now, and I'm not going to go through all of them. I know some of you probably have . . . Judge Jones and Judge King, I know you probably have a list of cases with qualified immunities, probably a long, long list, but Judge Duncan, you also have had some recent cases. I would remind you of the case of Ramirez versus Escajeda, which I think, Judge Jones, you were on that panel. Judge Duncan, you wrote it. It's a very similar case in this sense. It shows the intersection between law enforcement and mental health, because in that case, as you recall, you had an individual who was . . . the parents reported he was going to hang himself from his own basketball goal in the backyard. The law enforcement officer was dispatched to that scene, did not wait for backup, because that's what they are told to do. You don't wait. You do what you are trained to do. You run towards the danger, not away from it. All of us have that luxury. We can recoil from danger. It's that flight or fright, right? Flight or fight instinct. Well, as citizens, we get the right to say, yeah, it looks like stuff I don't want to be involved in. They're not. They don't get that right. It's their job. What they're paid to do, what they're trained to do is run towards the danger. In that case, that officer ran towards the danger. He decided to use a taser on the person hanging from the basketball goal. We can debate whether that was a good decision or not, but in that case, you correctly, Judge Duncan, ruled that without a case on point with even close facts, that had to be every single fact is the same, but they need to be somewhere in the same ballpark. We need to be playing the same sport, all right, that qualified immunity attaches. In that case, you correctly found, in my view, qualified immunity should have been given to that officer. In this case, it's the same. Our case is no different in the sense that there is not one single case that the plaintiff has given or that the district court, which I don't think actually listed one single case, there was no cases at any point saying, here are some facts very similar to this case. Under that case, it's been clearly established, you can't do whatever it is you're alleged to have done. Therefore, you're on notice. You can't do it. You don't get the benefit of qualified immunity. We have other cases. The Betz case, Judge Duncan, you again. The Garcia v. Blevins, another one of yours, Judge. Judge Jones, you were on the panel in Griffith v. City of Sugarland. The Rich case, Judge King, that was one of yours and I actually read it because it was interesting in relation to this case and that's . . . Look, if you're trying to guilt us into going the same way, I'm really joking, but . . . Not my intent. If you want to cite all these things in a 28-J letter, feel free, but none of us can remember anything about any of those cases because every time anything happens with the case, so . . . I understand. There are a lot of cases. The Rich case, I would point out though, is interesting because . . . and I didn't have it when we were writing our brief because we didn't know you were going to be on the panel frankly, but when we found out who was on the panel, we started looking at what kind of qualified immunity cases are out there so that I could at least get prepared for questions that might be asked. In that case, it's an interesting case because that was an individual who had some mental issues and he became injured when the police were trying to restrain him at the request of the facility. He hit his head against some kind of cabinet and there was . . . the testimony was pretty much . . . What's the site? 920 F3rd 288. In that case, Judge King, your panel correctly found that qualified immunity attaches because again, there is no case even remotely close to this one so that's what qualified immunity exists for, this very same reason because it's a policy decision the Supreme Court and the courts across this land made many, many decades ago and it was the correct one, which is we don't want government officials to be afraid to do their job because they might end up here. Because we don't want that proverbial Monday morning quarterback to exist where the government officials, the police officer, fire department, whoever says, you know what, I probably should go try to save this person but I'm scared I might get sued so I'm just going to not do that. I'm going to stay in my car today. That's the policy behind qualified immunity. It's a great policy. It exists for a good reason and it should be utilized in this case because in all due respect to Judge Zaney, he just missed it in this case. He didn't apply qualified immunity correctly and therefore it's here, it's correctly here and this court should reverse and dismiss this case. Thank you. Okay. Thank you very much. We will stand in recess.